IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| United States of America., | ) | |
|---|---|---|
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **No.** 12 CR 415 |
| | ) | |
| Deandre Cherry, | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

# MEMORANDUM OPINION AND ORDER

Defendant moves to suppress evidence and statements recovered by police following his arrest on May 31, 2012. The motion challenges the sufficiency of probable cause to arrest him because the arresting officers relied upon information which lacked sufficient indicia of reliability either from any prior history with the informant or from verification of the information received. An evidentiary hearing was held and the parties submitted post hearing briefs. The Court now rules.

In a similar case, the Seventh Circuit stated that:

> Although the police did not know the informant before the initial phone call, that alone does not make the informant's information unreliable. It means at most that the agents might need to do more work to verify the information given by the informant, which the agents did that in this case. . . . In fact, before stopping Oliva, the agents observed him taking the actions which the informant had said to expect. That is exactly the type of corroboration that counts. *See Navarro,* 90 F.3d at 1254 ("[B]ecause the surveillance preceding the stop corroborated the information from the informant, the law enforcement officers had probable cause for both the arrest

and search"); *Alabama v. White,* 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (stating that if "an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.").

Unfortunately for Oliva, "everything transpired as the informant described." . . . The informant told police that his dealer was a Hispanic male named Edwin. At the pre-arranged time, agents observed a Hispanic male drive to the informant's house, stop briefly, then park. The Hispanic male got out of the car, with another man, and walked to the informant's home. . . . The police verified each piece of the informant's information by observing it happen. When events unfolded as predicted, the police had all the corroboration they required. Actual events did not contradict any aspect of the informant's information.

*U.S. v. Oliva*, 385 F.3d 1111, 1114 -1115 (7th Cir. 2004) (certain internal citations omitted).

The case at bar is similar to *Oliva* in many respects. At the time of the arrest, the arresting officers had the following information: 1) the cooperating defendant was a drug dealer who dealt in large quantities of cocaine (Tr. 19-20); 2) he was arrested while attempting to take possession of 26 kilograms of cocaine; 4) the cooperating defendant told the arresting officers that he had a prearranged plan to deliver 13 kilograms of the cocaine to Mo (Defendant) and Big Al; 5) the cooperating defendant was driving a car with a built-in trap for hiding narcotics, which he was intending to use to deliver the narcotics; 6) the cooperating defendant told the officers that he intended to deliver the narcotics to Mo at a house on 147th Street near Loomis; 7) the cooperating defendant told the officers that Mo drove a white Mercedes SUV; 8) the cooperating defendant had the cell phone number of the party to whom he was to deliver the cocaine and on the agent's instructions, the cooperating defendant called Mo and changed the meeting place to a parking lot at the 159th Street and Kedzie in Markham in front of a Boost Mobile Store at 8:00 PM; 9) at 7:50 PM, the cooperating defendant called Mo and informed him he was 10 minutes

away; 10) at approximately 8:00 PM, surveillance officers confirmed that a white Mercedes SUV is seen driving around the area of the parking lot; 11) the arresting officers observed the white Mercedes SUV drive into the parking lot and park, of all places, next to the cooperating defendant's car; 12) the driver of the white Mercedes SUV is observed exiting his car and entering the passenger side front seat of the cooperating defendants car; 13) a few minutes later the cooperating defendant gave the arrest signal by exiting his vehicle, having previously been instructed to give the signal only after he had shown Mo the sham cocaine stored in the narcotics trap in the rear passenger side door panel of the automobile.

Since the amount of cocaine in the cooperating defendant's possession (26 kilograms) could not have been for personal use, it would be reasonable for the officers to conclude that the cooperating defendant intended to sell/deliver some or all of that cocaine to others. Given what they knew at the time, it would also be reasonable for the arresting officers to believe that the cooperating defendant would have knowledge about persons who could supply and be willing to purchase kilogram quantities of cocaine. (Tr. 47, 69 -71.) The meeting of the cooperating defendant and Defendant, Mo, occurred in substantially the manner the cooperating defendant said it would, where he said it would occur, at the time he said it would occur, and Mo was driving the make, color and type of automobile the cooperating defendant said he would be driving. Furthermore, nothing the cooperating defendant said or predicted was contradicted by their observations.

The officers also knew from their own observations that just prior to the arrest signal, Defendant was seen to position himself in such a way as to allow him to look into the back of the cooperating defendant's automobile in a manner that would enable him to view the contents of

the narcotics trap. (Tr. 76, 87-88, 91.) Upon hearing the police sirens, Defendant attempted to run into his car and escape before the police could arrest him, evidencing knowledge of guilt.1 These facts taken together are sufficient to establish probable cause to arrest the defendant.

Defendant also argues that the evidence seized from his vehicle and his subsequent incriminating statements should be suppressed. A vehicle, of course, may be stopped and searched without a warrant if there is probable cause to believe that the vehicle contains contraband or other evidence of illegal activity. *United States v. Seymour*, 519 F.3d 700, 713 (7th Cir. 2008). The officers claim that heroin was in plain view inside Defendant's car thus giving them the requisite probable cause to search Defendant's car and seize the heroin.

The testimony of Officers Brazao, Crawford and O'Reilly was substantially consistent in describing the manner in which the arrest took place. Brazao and Crawford testified that when they first saw the satchel in Defendant's car, it was open and the suspect narcotics were in plain view, as depicted in Government Exhibit 2. O'Reilly does not recall seeing the satchel when he first looked inside the automobile as he was busy attempting to subdue Defendant and only glanced in for the purpose of making sure there were no other perpetrators in the automobile. There was some uncertainty as to how the driver's side door was opened or who opened it. O'Reilly clearly testified that it was Defendant who opened the front driver side door of his

---

1 Defendant contends that only "unprovoked flight" is proper to assist is establishing probable cause, citing *Marshall ex rel. Gossens v. Teske*, 284 F.3d 765 (7th Cir 2002) and *Illinois v. Wardlow*, 528 U.S. 119 (2000). In *Wardlow,* the Supreme Court found that reasonable suspicion existed to stop and frisk a suspect who had fled upon seeing police officers patrolling in an area known for heavy narcotics trafficking. In other words, fleeing at the mere sight of police officers approaching is suspicious behavior. In *Marshall*, the Seventh Circuit stated that Marshall's flight likely could not have provided reasonable suspicion even for a stop and frisk, let alone probable cause for an arrest, because his flight was in response to his observation of masked men with guns running towards him. Any "sane person" would run away from masked men with guns. *Marshall*, 284 F.3d at 771. Furthermore, in *Marshall*, the defendant ran towards the uniformed police officers, not away from them, to tell them robbers were chasing him. The officers in the case at bar were all wearing ballistic vests with police insignia, so they could not have been mistaken for robbers. Moreover, Defendant ran away from them, not towards them. (Tr. 12, 70, 77.)

vehicle before he was arrested in an attempt to get into his car. Resolving this issue is not crucial, however, as under the circumstances, the officers would have had the right to open the door in order to view the interior of the automobile which was obscured by tinted windows in order to inspect for weapons or other occupants who might pose a danger. *United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir. 1997).2

Officer Castaneda took photographs, Government's Exhibits 2-9, of the inside of the automobile and the contents thereof. As between photographs two and three, one showing the briefcase open with the narcotics in plain view and the other showing the briefcase closed with the contents hidden, he could not recall which photograph was taken first. According to the time stamp on the photographs, both were taken in the same minute of time. Castaneda stated that by the time he got to the car to take photographs, the car was already being searched by agents, and he took photographs of things that were pointed out to him by other agents. (Tr. 107.) Crawford further testified that he drove Defendant's car to the Markham police station because it was the intention of the officers to seize the car for forfeiture proceedings.

Defendant testified that in cooperation with his friend Al, who was also a drug dealer dealing mostly in marijuana, he had previously purchased heroin from the cooperating defendant and had discovered that the heroin was of poor quality. He informed Al, who arranged for an exchange of the bad heroin for an "equivalent" amount of cocaine. It was to effectuate this exchange that Defendant set out to meet the cooperating defendant the night he was arrested. Defendant testified that in preparation for the exchange, he prepared a zip lock bag with 364 grams of heroin, which he in turn placed inside the black plastic bag depicted in Government

---

2 Defendant himself testified that the purpose for tinting the windows to his car was to conceal anything he might have inside the car, including passengers.

Exhibit 8, along with 4 packets of mixed heroin. In another plastic bag, Defendant placed 14 grams of crack cocaine, which he intended to sell that night to his friend, Mike, who was waiting for him outside of his home in Harvey. Defendant then tied up the plastic bag and put it in the bottom of his briefcase. Defendant placed several car titles on top of the plastic bag as camouflage, and placed the briefcase on the floor of the front passenger seat of the car. Defendant denies ever having the briefcase and/or black bag open in his vehicle. Thus, the testimony of the police officers and that of Defendant with respect to the precise condition and location of the narcotics within his automobile is in direct conflict.3

    The Court finds the testimony of the police officers credible in that it was substantially consistent and, when taken in the context of the entire record, makes sense. The Court finds Defendant's testimony lacking in several significant respects. First, Defendant testified he did not expect the cooperating defendant to accept the drugs, but only to inform him that he would have to take the drugs to another location for delivery. But this makes little sense. If the meeting with the cooperating defendant was only to inform Defendant that he should drop off the poor quality heroin and/or pick up the replacement cocaine at some other place, there was simply no need for such a dangerous face-to-face meeting at night in a parking lot. That information could easily have been provided over the phone with little exposure to anyone. Next, Defendant declared that he was shocked when the cooperating defendant informed him that he had been riding around with bricks of cocaine in his vehicle, yet he himself was driving around with cocaine, heroin and large amounts of money in his vehicle. The cooperating defendant at least had a secret trap built into his automobile in which to hide the cocaine. It is

---

3 There appears to be no dispute that after his arrest, Defendant was informed of his Miranda rights and agreed to give a statement.

common practice for narcotics and other illegal substances to be transported in automobiles with such traps.  Nothing about that should have shocked Defendant.

Defendant's elaborate explanation as to why he would never drive around with heroin in plain view simply misses the point.  He was not arrested driving en route to the exchange.  He was arrested after he had parked his vehicle and while he was in the process of verifying that the replacement cocaine was available for exchange.  When Defendant set out for the exchange, the heroin, by his own testimony, was packed in a ziplock bag which was placed inside a black plastic bag that had been tied shut, positioned at the bottom of a locked briefcase and covered with layers of camouflaging documents and cocaine.  In order to perform the actual exchange, Defendant had to dig the heroin out of its hiding place and untie the black bag at some point.  If he expected to do this exchange alone at night in a parking lot, one would expect Defendant to want to do so as quickly as possible.  He had to know that he was at his most vulnerable, either to being set up or to being ripped off, at the point of the actual exchange.  Indeed, by his own testimony, Defendant was nervous about meeting at a parking lot.  The way to reduce his exposure would be to minimize the time required for the exchange and leave the area as quickly as possible.  The speed of the transaction would be enhanced if he took the heroin out from the bottom of the briefcase and inside the black bag sometime before going to the cooperating defendant's vehicle.  Once Defendant verified that the cooperating defendant had the cocaine for the exchange, he could return to his automobile, grab the heroin and make the exchange.  This is precisely what the officers describe they observed when they looked through the open door and windows of the defendant's car -- cocaine at the top of the briefcase where it could be quickly reached and transferred to the cooperating defendant's vehicle.  The briefcase itself was

unlocked and ready to receive the replacement cocaine. For these reasons, the Court concludes that the evidence supports a finding that the drugs were in plain view, thus providing probable cause for searching the vehicle.

The government argues in the alternative that the narcotics would inevitably have been discovered by lawful means and thus they are not subject to being suppressed. *Nix v.Williams*, 467 U.S. 431, 444 (1984); *United States v. Gravens*, 129 F.3d 974, 979 (7th Cir. 1997). The Court agrees. Once Defendant was arrested, his car had to be secured. It is highly unlikely that federal agents would leave the car abandoned in a public parking lot. (Tr. 14-15.) Indeed, Agent Crawford testified that he drove Defendant's vehicle to the Markham police station for safekeeping because it had been determined that the automobile was to be forfeited. (Tr. 66.) Under such circumstances, it is likely that, if the automobile had not been searched at the scene, an inventory search would have been completed at the police station in order to discover any dangerous items, document the contents of the automobile for safekeeping and protect the police from any accusations of theft or negligence. Such a search would have uncovered the cocaine and money recovered at the scene of the arrest.

For all of the above reasons, the motion to suppress the evidence and Defendant's subsequent statements is denied.

Dated: April 11, 2013

**SO ORDERED**                                        **ENTER:**

-------------------------------------

**RONALD A. GUZMÁN**

**District Judge**